**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **KYRA G. SHERMAN,** *Plaintiff* | : | |
| **v.** | : | **C.A. No. 26-cv-00258-MSM-RLA** |
| | : | |
| **WELLS FARGO BANK, N.A., alias,** *Defendant* | : | |

**PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS PENDING ARBITRATION**

## I. INTRODUCTION

Now comes Plaintiff Kyra G. Sherman in the above-cited matter and does hereby object to Defendant Wells Fargo Bank, N.A.'s ("Defendant" or "Wells Fargo") Motion to Compel Arbitration and Stay Proceedings Pending Arbitration, ECF No. 8 ("Motion"), and requests that this Court deny the Motion in its entirety.

By way of background, Ms. Sherman alleges that Wells Fargo discriminated against her because of her gender, sex, pregnancy, and status as a caregiver, and interfered with and retaliated against her for taking protected leave, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., the Pregnant Workers Fairness Act, 42 U.S.C. §§ 2000gg–2000gg-6, the Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1, *et seq*., the Rhode Island Civil Rights Act, R.I. Gen. Laws § 42-112-1, *et seq*., the Family and Medical Leave Act, 29 U.S.C. §2601, *et seq*., and the Rhode Island Parental and Family Medical Leave Act, R.I. Gen. Laws § 28-48-1, *et seq*. Compl., ECF No. 1, ¶¶ 1, 14, 74, 117–22. Wells Fargo terminated her employment on April 30, 2024, two days before she was scheduled to return from pregnancy leave. *Id.* ¶ 46. Ms. Sherman demanded a jury trial on all claims. *Id.* at 23. Wells Fargo now seeks to move those claims out of this Court and into private arbitration.

Wells Fargo's Motion should be denied because the only contract under which Ms.

Sherman ever worked for Wells Fargo does not contain an agreement to arbitrate. Ms. Sherman's employment is governed by a January 4, 2022 offer letter that Wells Fargo drafted, that she signed, and whose integration clause defines "the entire agreement between you and Wells Fargo" as the letter, its Conditions of Employment, "the Trade Secrets Agreement, and the Arbitration Agreement." ECF No. 8-3 at 5. That letter contains no arbitration terms of its own. It mentions "the Arbitration Agreement" only in form text, alongside a statement that new hires "are required to complete an Arbitration Agreement." *Id.* at 6. Wells Fargo admits that it did not require Ms. Sherman to sign an arbitration agreement under the January Offer. ECF No. 8 at 3.

Instead, Wells Fargo relies on an arbitration agreement Ms. Sherman signed in November 2021 with an earlier offer letter, under which she never worked, and asserts that it is a "standalone" contract that survived the January Offer. This argument is fundamentally inconsistent with established contract law. The January Offer superseded the November Offer, and Wells Fargo's own documents made the arbitration agreement part of that earlier "entire agreement." Whether the January Offer carries the MAA forward is therefore the dispositive question, and it is one for this Court to decide under Rhode Island contract law and with no presumption in favor of arbitration. And because the January Offer required new hires to complete an arbitration agreement, which Wells Fargo chose not to obtain, Ms. Sherman's continued employment cannot supply her assent. At a minimum, the reference to an arbitration agreement in the January Offer is ambiguous, and Rhode Island law construes that ambiguity against Wells Fargo, the party that drafted it.

## II. SUMMARY OF RELEVANT FACTS

On November 26, 2021, Wells Fargo offered Ms. Sherman employment as a Digital Consultant 5 RWF, with a start date of December 13, 2021. Def. Mot. Ex. 2 ("November Offer"), ECF 8-2 at 2. The November Offer was contingent on a background investigation and stated that Ms. Sherman's "start date may change depending upon the time it takes to complete this process."

*Id*. Also included in the November Offer letter is the following language:

> The offer letter, including these Conditions of Employment, the Trade Secrets Agreement, and the Arbitration Agreement, constitutes the entire agreement between you and Wells Fargo. No other guarantees or promises of any kind have been made concerning the terms of your employment.

*Id*. at 4.

Ms. Sherman signed the November Offer at 9:05 a.m. on November 26, 2021. *Id*. at 6. The "Wells Fargo Mutual Arbitration Agreement" ("MAA") at issue reflects Ms. Sherman's signature at 9:12 a.m. that same day, and while she has no recollection or record of signing the MAA, Ms. Sherman does not dispute that the signature on the MAA is identical to the signature on the November Offer that she did sign. ECF No. 8-1 at 2. The MAA contains no signature by Wells Fargo and no provision addressing whether it survives a later offer letter or a later integrated agreement. *Id*.

Ms. Sherman did not start on December 13, 2021; her start date was postponed by Wells Fargo. ECF No. 8-3 at 2 (reflecting a start date of January 18, 2022). On January 4, 2022, Wells Fargo issued a new offer letter ("January Offer"), which Wells Fargo describes as a "second Offer of Employment" and an "updated" offer. ECF No. 8-3; Def. Mot., ECF No. 8, at 2–3. The January Offer is a complete offer letter that does not amend, update, or refer to the November Offer. *See generally* ECF No. 8-3. By its own terms it is a distinct agreement. Moreover, it set new and additional terms that differ from the November Offer, specifically:

1. a start date of January 18, 2022, ECF No. 8-3 at 2;
2. conditions of employment requiring proof of COVID-19 vaccination or regular testing, *id.*;
3. a benefits effective date of March 1, 2022, rather than February 1, 2022, and an enrollment deadline of February 14, 2022, rather than January 14, 2022, *compare id.* at 3, *with* ECF No. 8-2 at 3; and

4. a new acceptance deadline of January 6, 2022, ECF No. 8-3 at 3.

The January Offer contained its own integration clause:

> The offer letter, including these Conditions of Employment, the Trade Secrets Agreement, and the Arbitration Agreement, constitutes the entire agreement between you and Wells Fargo. No other guarantees or promises of any kind have been made concerning the terms of your employment.

*Id.* at 5.

It also states that "[a]ll new hires are required to complete an Arbitration Agreement." *Id.* at 6. The January Offer does not attach, quote, date, or otherwise identify any arbitration agreement, and does not mention that Ms. Sherman had purportedly signed one. *See generally id.* Ms. Sherman signed the January Offer on January 4, 2022. *Id.* at 8. Wells Fargo concedes that it did not present Ms. Sherman with an arbitration agreement in connection with the January Offer, and she did not sign one. ECF No. 8 at 3 (she "was not required to re-execute the Arbitration Agreement upon her execution of the updated January 4, 2022 Offer of Employment"). Nothing in the MAA, November Offer, or January Offer expressly provides that a prior-executed MAA between the parties is carried forward, or that a new hire need not re-execute an arbitration agreement upon receiving another offer from Wells Fargo. *See generally* ECF Nos. 8-1, 8-2, 8-3.

Notwithstanding the fact that Ms. Sherman had not signed a new arbitration agreement, Ms. Sherman began work on January 18, 2022.[1] Wells Fargo terminated her employment effective April 30, 2024, two days prior to Ms. Sherman's scheduled return-to-work date from maternity leave. Compl., ECF No. 1, ¶¶ 46-54.

[1] The Complaint incorrectly states that Ms. Sherman was hired in June 2022. Compl., ECF No. 1, ¶ 16. That is a typographical error. Ms. Sherman began work on January 18, 2022, the start date set by the January Offer. ECF No. 8-3 at 2. The error does not affect any allegation material to her claims, and Wells Fargo does not contend that Ms. Sherman began work on any other date or under any offer other than the January Offer. *See* ECF No. 8 at 2–3, 5. Plaintiff will correct the error by amendment if the Court deems it necessary.

## III. STANDARD OF REVIEW AND APPLICABLE LAW

### A. Standard of Review

Courts in the First Circuit apply the summary judgment standard in adjudicating motions to compel arbitration and " 'must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.' " *Lopes v. Dollar Tree Stores, Inc.*, No. 25-cv-356-MRD-AEM, 2026 LX 490701, at *5 (D.R.I. Aug. 28, 2026) (quoting *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 175 (1st Cir. 2021)).

A party moving to compel arbitration must show " 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope.' " *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011) (quoting *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003)). The burden is on the movant to prove the existence of a valid and applicable arbitration agreement, and courts may not place on the non-movant the burden of disproving an agreement. *Air-Con*, 21 F.4th at 176 ("[T]he substantive law on the enforceability of arbitration agreements puts the burden on the party moving to compel arbitration to show that it is entitled to that outcome….Thus, the relevant issue was not whether Air-Con 'failed to show' the absence of an agreement. Rather, Daikin Applied had to affirmatively demonstrate the existence of a binding agreement to arbitrate." (citation omitted)).[2]

Accordingly, before the Court reaches consideration of the Federal Arbitration Act ("FAA") and any presumption thereunder, it must first determine whether an agreement to arbitrate exists while construing the record in the light most favorable to the Plaintiff and drawing all reasonable inferences in her favor. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 303

[2] *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000), referenced by Wells Fargo for the proposition that "[t]he party opposing arbitration ultimately bears the burden of proving the claims at issue are unsuitable for arbitration," concerns whether claims under a concededly valid agreement are unsuitable for arbitration, not whether an agreement exists. ECF No. 8 at 4–5.

(2010) ("We have applied the presumption favoring arbitration, in FAA and in labor cases, only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed and …is legally enforceable and best construed to encompass the dispute."); *see also Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024). "In other words, while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Applied Energetics, Inc. v. Newoak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011) (citing *Granite Rock,* 561 U.S. at 303).

Indeed, though parties may waive their rights to a judicial forum through contract, "there can be no waiver in the absence of an agreement signifying an assent." *McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir. 1994).

**B. Rhode Island Contract Law, Not the FAA, Governs the Existence of any Agreement to Arbitrate, With No Presumption of Arbitrability.**

Whether the parties agreed to arbitrate is decided under "ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 552 (1st Cir. 2005) (" '[A]rbitration is a matter of contract,'… and for the most part, general principles of state contract law control the determination of whether a valid agreement to arbitrate exists." (citations omitted)).

Rhode Island applies its ordinary rules of contract formation to arbitration agreements, as the FAA requires. *See Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 581 U.S. 246, 251 (2017) ("The FAA makes arbitration agreements 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' 9 U. S. C. §2. That statutory provision establishes an equal-treatment principle: A court may invalidate an arbitration agreement based on 'generally applicable contract defenses…' "). Under those rules, "[m]utual assent *objectively*

*manifested* by the writings of the parties is a condition precedent to the formation of a binding agreement to arbitrate." *Stanley-Bostitch, Inc. v. Regenerative Envtl. Equip. Co.*, 697 A.2d 323, 326 (R.I. 1997) (emphasis added). Consistent with that general requirement, a duty to arbitrate must rest on showing a definite intent to arbitrate. *Polytop Corp. v. Chipsco, Inc.*, 826 A.2d 945, 947 (R.I. 2003); *Dep't of Corr. v. R.I. Bhd. of Corr. Officers*, 866 A.2d 1241, 1247 (R.I. 2005) ("A duty to arbitrate a dispute arises only when a party agrees to arbitration in clear and unequivocal language, and even then, the party is only obligated to arbitrate issues that it explicitly agreed to arbitrate.").

Ordinary Rhode Island rules also govern how contractual ambiguity is resolved. "When ambiguity is present, and the document's language is susceptible to more than one reasonable interpretation, the language will be strictly construed with all ambiguities decided against the drafter." *Monahan v. Girouard*, 911 A.2d 666, 672 (R.I. 2006). That rule applies fully here. While the FAA's presumption in favor of arbitration resolves doubts about the scope of an agreement that exists, it does not resolve doubts about whether one was formed. *Granite Rock*, 561 U.S. at 301–03.

## IV. ARGUMENT

### A. The January Offer Superseded the November Offer, and the MAA Ended When the Agreement it Was a Part of Was Replaced.

As an initial matter, under Rhode Island contract integration principles, the final writing adopted as an expression of the parties' agreement controls over prior expressions concerning the same transaction; thus, the final writing creating an agreement will control, and *previous iterations of that agreement are immaterial*. *Fram Corp. v. Davis,* 401 A.2d 1269, 1272 (R.I. 1979) ("[W]hen parties to a contract have adopted a written agreement as the final expression of their intention . . . all other expressions of intention that have occurred prior to or contemporaneous with the making of the agreement are immaterial in ascertaining the terms of the transaction.").

Here, the January Offer is that writing. It is a complete offer letter, drafted by Wells Fargo and signed by Ms. Sherman. Indeed, it opens, "Congratulations! I am pleased to extend you an offer of employment," asks for a response by January 6, 2022, and provides that "[b]y signing and submitting this offer letter, you accept and agree to all terms and conditions of this offer of employment." ECF No. 8-3 at 2, 3, 8. It does not mention the November Offer, does not state that it is an amendment to the November Offer, and is not a direct copy of the November Offer. *Compare* ECF No. 8-2, with ECF No. 8-3. It sets the start date, compensation, benefits dates, and new conditions under which Ms. Sherman actually worked, specifically the COVID-19 testing and vaccination requirements. ECF No. 8-3 at 2. Moreover, the fact that it was *not necessary* to issue a new offer letter based only on start date,[3] and that the new offer contained new and additional terms from Wells Fargo which Ms. Sherman had to agree to as conditions of the offered employment, clearly shows that the January Offer was intended to supersede the November Offer in full. Wells Fargo did not present Ms. Sherman with a new arbitration agreement, give her any notice that the old MAA would remain in effect under this new and separate offer of employment, or insert any provision in it that the previously signed MAA was part of this agreement. On January 4, 2022, Ms. Sherman accepted this new offer without signing a new arbitration agreement, at which point the January Offer replaced the November Offer as the parties' integrated and operative agreement.

Thus, the January Offer superseded the November Offer. Under Rhode Island law, a later agreement between the same parties that covers the same subject matter, with terms inconsistent with the earlier one, replaces it and becomes the parties' only agreement on that subject. *Biller v. S-H OpCo Greenwich Bay Manor, LLC*, 961 F.3d 502, 515 (1st Cir. 2020) ("[W]hen a later bargain between the same parties 'completely cover[s] the same subject-matter . . . as an earlier agreement'

[3] ECF No. 8-2 at 2 ("Your start date may change depending upon the time it takes to complete this process.")

but 'contain[s] terms inconsistent with the former contract, so that the two cannot stand together,' it replaces the 'earlier contract and becomes the only agreement of the parties on the subject.' " (citations omitted)). Wells Fargo does not argue that the November Offer remains in force; it calls the January Offer the "updated" offer instead of what it really is: a new offer superseding the prior one. ECF No. 8 at 3. That distinguishes *Biller*, where the First Circuit compelled arbitration because the plaintiffs showed no superseding agreement at all and instead relied on conduct and an unsigned draft that contained an identical arbitration clause. 961 F.3d at 515-16. Here, by contrast, the parties signed a superseding, integrated writing. This District has applied the same rule: "Parties can agree to eliminate contract provisions, even arbitration clauses and class waivers, by subsequent agreement covering such issues. These later agreements between the parties on the same subject matter supersede" the earlier one. *Metcalfe v. Hyundai Capital Am.*, 698 F. Supp. 3d 239, 242 (D.R.I. 2023) (later contract with entire-agreement clause superseded earlier class-action waiver).

When an employment agreement that contains an arbitration agreement is replaced with a new, separately documented, agreement, the old arbitration agreement does not carry forward unless the parties' objective words or conduct show that they intended it to. *See Frank v. 84 Components Co.*, No. NA02-0014-C-H/H, 2002 U.S. Dist. LEXIS 11218 (S.D. Ind. June 18, 2002). In *Frank,* an employee "signed an application that included [an] arbitration agreement" applying to "Any and all statutory or common law disputes, claims or controversies…by myself against the Company… ." *Id*. at *2-3. She was then terminated a little less than a year later with the "termination notice indicat[ing] that she was eligible for rehire." *Id* at *3. She was rehired a few months later. *Id*. This time she signed a handbook acknowledgment and routine new-hire forms but did not sign a new application or arbitration agreement. *Id*. When she later sued over her second termination, the employer moved to stay the case pending arbitration, relying on the original agreement. *Id*. at *1.

The court denied the motion, explaining that "[p]arties who once agreed to arbitrate all of their future disputes can later agree not to do so" and that the earlier agreement " 'may have been universal, but it was not eternal.' " *Id*. at *4-5 (quoting *Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866, 871–73 (7th Cir. 1985)). The employer in Frank asserted that "the company's 'policy provides that a former employee is not required to complete a new Application for Employment unless the employee has not been employed by 84 Components for more than two (2) years' " and that " 'the intention and policy of 84 Components [was] that the original Application for Employment apply to all subsequent periods of employment by the applicant.' " *Id*. at *6. This, the employer argued, made it even more clear that the original arbitration agreement continued to bind the employee after her rehire. The court rejected this, holding that "[t]his evidence is not sufficient to hold Frank to the original arbitration agreement. The basis of contract law is not the parties' subjective intentions but the objective indications of their intentions -- in words or deeds." *Id*. The employer's policy had never been communicated to the employee, and the employer offered no evidence of "words or actions" that she should have understood as an agreement to arbitrate when she was rehired. *Id*. at *7.

The same reasoning applies here. As in *Frank*, the question is whether an earlier arbitration agreement governs a later, separately documented engagement, and the answer turns on the parties' objective manifestations, not the employer's unstated intent. The break in Frank was a termination and rehire; here, it is contractual. Wells Fargo did not amend the November Offer. It issued a new, separate offer with its own terms, its own acceptance deadline, and its own integration clause. ECF No. 8-3 at 2–3, 5. That offer was written by Wells Fargo and accepted by Ms. Sherman, and she worked only under that offer.

Nor does the absence of a gap in employment help Wells Fargo. Frank distinguished cases applying an earlier contract to employees who simply kept working past its original term without interruption. *Id*. at *7–8. That reasoning assumes an existing employment relationship governed

by the earlier contract. Ms. Sherman had none; she never worked under the November Offer at all. The January Offer did not continue an existing relationship. It created the only one the parties ever had.

Unlike the rehire documents in *Frank*, the January Offer does mention "the Arbitration Agreement." But that reference does not identify the MAA, and it describes an agreement that new hires must still "complete." ECF No. 8-3 at 5–6; *see* Section IV.C. Ms. Sherman did not sign a new arbitration agreement because Wells Fargo never presented one after she accepted the new offer, as the terms of that offer required. As in *Frank*, Wells Fargo's after-the-fact position that the MAA "remained valid," and its explanation that "because Plaintiff had already executed the Arbitration Agreement . . . she was not required to re-execute" it, ECF No. 8 at 3, 5, are statements of its own intent, which the January Offer never communicated to Ms. Sherman. Nor does the breadth of the MAA change the result; the agreement in *Frank* was just as broad. *Frank*, 2002 U.S. Dist. LEXIS 11218, at *1–2.

While requiring a new arbitration agreement with a new, integrated offer may be clunky for employers, the alternative, that arbitration agreements remain in force eternally while employment agreements come and go, is even less reasonable. This position, the one Wells Fargo advances, would logically allow an arbitration agreement signed with an offer letter that never led to employment to govern a later employment agreement between the same two parties, no matter how much later that agreement came into force and even if that agreement made no mention of an arbitration agreement. This could mean someone being held to a twenty (20) year old arbitration agreement signed along with a pile of other papers for a job they never actually worked, when twenty (20) years later they accept a job offer with the same or a successor employer for a totally different job, and where there is no arbitration agreement assented to, other than the ancient and dusty one. This is the far more unreasonable outcome. The correct approach is that an employer, as the drafter and with greater bargaining power, should simply dot their I's and cross their T's

when they make a new, distinct offer of employment, or rehire someone, rather than relying on old agreements.

**B. The MAA Is Not a "Standalone" Agreement That Survives Outside the November Offer it Was a Part of.**

To circumvent its own superseding new offer, Wells Fargo argues that the MAA as a "standalone agreement remained valid" after Ms. Sherman signed the January Offer. However, the January Offer contains an integration clause providing: "The offer letter, including these Conditions of Employment, the Trade Secrets Agreement, and the Arbitration Agreement, constitutes the entire agreement between you and Wells Fargo. No other guarantees or promises of any kind have been made concerning the terms of your employment." ECF No. 8-3 at 5. It references an arbitration agreement generally, but does not integrate or specifically reference the November MAA. Because the January Offer is the parties' integrated agreement, whether Ms. Sherman agreed to arbitrate depends on its terms, decided under Rhode Island law without the FAA's presumption. *Fram*, 401 A.2d at 1272; *Granite Rock*, 561 U.S. at 301–03. Whether Ms. Sherman is bound to arbitrate turns on whether that reference brings the November MAA into the January Offer, which Plaintiff addresses below.

That integration clause also answers Wells Fargo's "standalone" argument, because the MAA cannot bind Ms. Sherman on its own, outside the January Offer. First, the clause defines the parties' entire agreement and disclaims any "other guarantees or promises . . . concerning the terms of your employment." ECF No. 8-3 at 5. A mutual promise to arbitrate employment disputes is such a promise; the letter itself describes arbitration as a requirement of employment. *Id.* at 6. So any arbitration promise the integration clause does not specifically include, *including the November MAA*, has been disclaimed. Second, the integration clause includes arbitration only by naming "the Arbitration Agreement," which the letter then describes as an agreement that "new hires are required to complete[.]" *Id.* at 5-6. It does not identify the MAA Ms. Sherman had already

signed. Last, due to Wells Fargo's own drafting, the MAA was part of the November "entire agreement" that the January Offer replaced.

Wells Fargo cites no authority for its "standalone" label. ECF No. 8 at 3, 5. While the First Circuit addressed when an arbitration agreement stands apart from a related document in *Pelletier v. Yellow Transportation, Inc.*, 549 F.3d 578 (1st Cir. 2008), that decision does not support Wells Fargo's "standalone" label; its reasoning supports Ms. Sherman. In *Pelletier*, an employee argued that a dispute resolution agreement ("DRA") she signed distinctly but contemporaneously with her employment application was displaced by the application's merger clause and that the DRA lapsed when the application expired 30 days after it was submitted. *Id.* at 579–82. The court rejected both arguments. Although the merger clause stated that it "takes the place of all prior or contemporaneous agreements," the court held that it was limited to the parties' "right to terminate" and therefore did not reach the substantive content of the DRA, which addressed a different subject: the forum for resolving disputes. *Id.* at 580–82. Further, the DRA did not lapse with the application because nothing limited or bound its duration to the employment application itself. *Id.* at 583. *Pelletier* thus turned on the subject the merger clause covered, and no later written agreement between the parties was at issue. Here, the parties' later integrated writing, the January Offer, addresses arbitration directly: it defines their "entire agreement" to include an arbitration agreement and describes that agreement as one new hires "are required to complete." ECF No. 8-3 at 5–6. By the same reasoning, that clause governs which arbitration agreement is part of the parties' bargain, and a later agreement on the same subject replaces an earlier one. *Biller*, 961 F.3d at 515; *Metcalfe*, 698 F. Supp. 3d at 242. The MAA's coverage of claims arising from an "application for employment," ECF No. 8-1 at 2, defines which claims it would reach if it remained part of the parties' contract; it does not establish that it does. The question is therefore not whether the MAA lapsed on its own, which Ms. Sherman does not argue, but whether the January Offer incorporates it, which it does not. *See* Section IV.C below.

Nor does the rule of severability save the MAA here. An arbitration agreement generally survives the end of the contract it accompanies, so a party resisting arbitration must challenge the arbitration agreement itself. *Biller*, 961 F.3d at 512. Here, Ms. Sherman does just that. She does not argue that the MAA lapsed merely because the November Offer lapsed. She argues that the January Offer, a later integrated agreement, addressed arbitration directly: it made "the Arbitration Agreement" part of the parties' entire agreement and described it as one that new hires must still complete. That reference does not identify or incorporate the November MAA, so the January Offer superseded it. Under the process Wells Fargo itself wrote into the January Offer, a binding arbitration agreement required completing a new one, which never happened. That is a challenge to the arbitration agreement itself for this Court to decide.

**C. The January Offer Does Not Contain an Agreement to Arbitrate and its Reference to "the Arbitration Agreement" Does Not Clearly and Objectively Incorporate the November MAA.**

The January Offer contains no actual arbitration terms – there is no promise to arbitrate, no description of covered claims, and no waiver of a judicial forum or jury appears within its four corners. *See generally* ECF No. 8-3. The November MAA can therefore bind Ms. Sherman *only if* the January Offer incorporates it by reference, but the documents do not say what happens to a previously signed arbitration agreement when the offer letter it was originally part of expires and a new offer letter issues. *See generally* ECF Nos. 8-1, 8-2, 8-3.

Rhode Island permits a contract to incorporate another instrument by reference, but "[i]n order for an instrument to be incorporated into and become part of a contract, the instrument must actually be incorporated; it is not enough for the contract to merely mention the instrument, and the referring language in the contract must demonstrate the parties intended to incorporate all or part of the referenced instrument." *Mgmt. Capital, L.L.C. v. F.A.F., Inc.*, 209 A.3d 1162, 1175 (R.I. 2019) (quoting 17A Am. Jur. 2d *Contracts* § 381). *Dulong v. Merrimack Mutual Fire Insurance Co.*, 272 A.3d 120 (R.I. 2022), shows what specificity that requires. There, an insurer

denied umbrella coverage based on a restricted-insured endorsement the policyholder had signed for an earlier policy, and the question was whether that endorsement was part of a later policy. *Id.* at 123-124. The court held that it was, because the later policy's declarations identified the endorsement by form number and title, and the endorsement itself bore the policy number and named the insureds. *Id.* at 127. Because the endorsement was "clearly and specifically referenced," it was incorporated "even without attachment." *Id.* ("Therefore, we hold that, when an endorsement is clearly and specifically referenced in the language of an insurance policy, as here, the endorsement is properly incorporated into the policy even without attachment."). The January Offer provides nothing comparable. It does not give the November MAA's title or date or mention that Ms. Sherman had signed it. More importantly, nothing in the January Offer identifies or even references the specific MAA.

The January Offer's reference to an unspecified "Arbitration Agreement" falls well short of the applicable standard.

**First**, the reference is not itself a promise to arbitrate. The January Offer's only arbitration language reads in full: "In addition, when employment disputes cannot be resolved internally, it is helpful to do so through private arbitration instead of court. All new hires are required to complete an Arbitration Agreement in which you and Wells Fargo mutually agree to final and binding arbitration of your employment disputes when they cannot be resolved internally." ECF No. 8-3 at 6. The first sentence states a preference. The second places the parties' mutual promise in a separate document: an Arbitration Agreement "*in which*" the parties agree. *Id.* (emphasis added). The letter describes that agreement; it is not that agreement.

**Second**, the January Offer identifies no particular document. The letter describes the general terms of an arbitration agreement, but it does not give the MAA's title, date, or signature, does not attach it, and does not mention that Ms. Sherman had already signed one. *See generally* ECF No. 8-3. *Contrast Dulong*, 272 A.3d at 127 (endorsement identified by form number,

description, insureds' names, and policy number). Indeed, although the integration clause refers to "the Arbitration Agreement," the passage that explains it refers to "an Arbitration Agreement" that new hires must complete. ECF No. 8-3 at 5–6. That general phrasing points to an agreement not yet identified, one that would become specific only once a new arbitration agreement was signed with or after the January Offer.

**Third**, the January Offer merely describes an act still to be done. New hires are "required to *complete* an Arbitration Agreement." ECF No. 8-3 at 6 (emphasis added). It is notable here that the article is indefinite, "an Arbitration Agreement," and the act which it describes, signing one as a condition of employment, is framed as something to be done in the future, whether immediately after accepting the offer letter or at some other time Wells Fargo provided an Arbitration Agreement that would have to be signed as a condition of employment. Read with the integration clause, "the Arbitration Agreement" most naturally refers to the agreement to be completed under, *and after*, that January Offer was accepted.

**Fourth**, both the integration sentence and the arbitration passage are identical in the two offer letters. *Compare* ECF No. 8-2 at 4–5, *with* ECF No. 8-3 at 5–6. Neither was written to account for an agreement already on file. In the November Offer, the identical language referred to an arbitration agreement Ms. Sherman had not yet signed; she signed the MAA seven minutes *after* accepting that offer. ECF No. 8-1 at 2; ECF No. 8-2 at 6. Read the same way, the January Offer's identical language refers to an agreement to be completed under and after that offer.

**Fifth**, Wells Fargo treats the January Offer's arbitration requirement as both binding and unnecessary. It says the January Offer "required as a condition of her employment her execution of the Arbitration Agreement," ECF No. 8 at 5, *then concedes it did not obtain that execution*, *id.* at 3. Wells Fargo cannot have it both ways. If, as Wells Fargo says, the January Offer made execution of an arbitration agreement a condition of employment, that condition was never fulfilled, and no arbitration agreement was formed under the January Offer. An offeror that

prescribes how a term is to be accepted is bound by that choice, and where the prescribed manner is not followed, no agreement on that term results. *See infra* p. 17 (discussing manner of acceptance). If instead the January Offer required nothing further, then its reference to "the Arbitration Agreement" must itself incorporate the November MAA, which, for the reasons above, it does not. Either way, Wells Fargo's decision not to obtain an arbitration agreement under the January Offer does not supply Ms. Sherman's assent to arbitrate. Wells Fargo wrote these agreements and created the requirement that Ms. Sherman assent to "an Arbitration Agreement" after accepting the offer of employment. That Wells Fargo did not follow through in actually getting that assent from Ms. Sherman after she accepted the January Offer, which Wells Fargo decided to make a separate and fully integrated agreement rather than an amendment to the November Offer, is Wells Fargo's fault.

Ms. Sherman recognizes Wells Fargo's contention that "the Arbitration Agreement" means the MAA she signed with the November Offer. As stated above, Ms. Sherman submits the plain language of Wells Fargo's January Offer letter states otherwise: an arbitration agreement to be completed under that offer. Even if, *arguendo*, Wells Fargo's claimed reading is plausible, a mention that can reasonably be read either way does not "demonstrate the parties intended to incorporate" a particular instrument. *Mgmt. Capital*, 209 A.3d at 1175 (quoting 17A Am. Jur. 2d *Contracts* § 381). A single definite article in boilerplate carried over from an earlier offer is not the "[m]utual assent objectively manifested by the writings of the parties" that Rhode Island law requires. *Stanley-Bostitch*, 697 A.2d at 326. Furthermore, to the extent the reference is ambiguous, the ambiguity is construed against Wells Fargo, which drafted it. *Monahan*, 911 A.2d at 672.

Moreover, Ms. Sherman's continued employment cannot supply the missing assent. Wells Fargo has not asserted as much, but to be clear, the January Offer itself specified how the parties would agree to arbitrate: new hires are "required to complete an Arbitration Agreement[.]" ECF No. 8-3 at 6. Under Rhode Island law, the offeror controls "the offer and the terms of its

acceptance." *In re Newport Plaza Assocs., L.P.*, 985 F.2d 640, 645–46 (1st Cir. 1993). The offeror "is entitled to insist on a particular mode of manifestation of assent." Restatement (Second) of Contracts § 30 cmt. a (1981). And "[i]f an offer prescribes the . . . manner of acceptance its terms in this respect must be complied with in order to create a contract." *Id.* § 60; s*ee also John Hancock Mut. Life Ins. Co. v. Dietlin*, 199 A.2d 311, 313 (R.I. 1964) (where assent could be manifested only by signature, failure to obtain signature meant no contract was formed). Here, Wells Fargo did not merely suggest a way to agree to arbitrate; it "required" completion of a separate agreement. Having not asked Ms. Sherman to assent to an arbitration agreement in the manner required by Wells Fargo under the January Offer, it cannot now treat her work as a substitute and change the very terms it wrote and required. Whatever role continued employment plays in assessing consideration, nothing in the record told Ms. Sherman that beginning work would be treated as assent to an unidentified arbitration agreement.

Finally, to the extent execution of an arbitration agreement was a condition of employment, Wells Fargo's decision not to enforce its own purported requirement to have her sign an arbitration agreement with the January Offer is effectively a waiver of said requirement. Under Rhode Island law, waiver is the "voluntary, intentional relinquishment of a known right," and it may be shown by action or inaction. *Haxton's of Riverside, Inc. v. Windmill Realty, Inc.*, 488 A.2d 723, 725 (R.I. 1985). Wells Fargo had the right to condition Ms. Sherman's employment on completing an arbitration agreement; the January Offer said so. ECF No. 8-3 at 6. Wells Fargo admits it chose not to exercise that right: Ms. Sherman "was not required to re-execute the Arbitration Agreement." ECF No. 8 at 3. It then employed her for more than two years without one. Having waived the only manner of assent its own offer prescribed, Wells Fargo cannot now supply assent by other means. *See* Restatement (Second) of Contracts § 60. Wells Fargo's only response, that the November MAA already satisfied the requirement, depends on reading the January Offer's

reference to "the Arbitration Agreement" to mean the November MAA, which, for the reasons above, it does not.

Each offer letter defines the entire agreement as the letter plus its attendant documents. Thus, Wells Fargo must show either an arbitration agreement executed under the January Offer or a clear incorporation of the November MAA into it. It has shown neither.

## V. CONCLUSION

The only contract under which Ms. Sherman ever worked is the January Offer, which superseded the November Offer and contains no agreement to arbitrate. Its passing reference to "the Arbitration Agreement" identifies no document and describes an agreement new hires must still "complete," which Wells Fargo never asked her to do. That is not the clear assent Rhode Island law requires, and any ambiguity in Wells Fargo's own form is construed against it.

WHEREFORE, Ms. Sherman respectfully prays that this Court deny Wells Fargo's Motion to Compel Arbitration and Stay Proceedings Pending Arbitration in its entirety.

Plaintiff,
By her attorneys,
**SINAPI LAW ASSOCIATES, LTD.**

**Date: October 23, 2026**

**/s/ Danilo A. Borgas**
**Danilo A. Borgas, Esq. (#9403)**
**Richard A. Sinapi, Esq. (#2977)**
**Riley M. O'Brien, Esq. (#10575)**
Sinapi Law Associates, Ltd.
2374 Post Road, Suite 201
Warwick, RI 02886
Phone: (401) 739-9690
FAX: (401) 739-9040
Email: dab@sinapilaw.com
ras@sinapilaw.com
rmo@sinapilaw.com